UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

    File No. 1:01-CR-262

    HON. ROBERT HOLMES BELL

ANTONIO RAMOS GARCIA,

    Defendant.
    _____/

# **O P I N I O N**

Defendant Antonio Ramos Garcia has moved to dismiss the indictment based upon violations of his right to a speedy trial under the Sixth Amendment and Rule 48(b) of the Federal Rules of Criminal Procedure. For the reasons that follow Defendant's motion will be denied.

## I.

On November 28, 2001, the grand jury returned an indictment charging Defendant Antonio Ramos Garcia, Javier Ramos Garcia, and Ricardo Gonzalez with conspiracy to possess with intent to distribute and to distribute 500 grams or more of methamphetamine in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A)(viii). (Dkt. No. 1, Indictment.) Defendant was not arrested on this indictment until May 7, 2009, more than seven years after the indictment was returned. Defendant contends that the seven-year delay from the time of his indictment to the time of his arrest violated his right to a speedy trial.

The Sixth Amendment guarantees that, in all criminal prosecutions, the accused shall enjoy the right to a speedy trial. *Doggett v. United States*, 505 U.S. 647, 651 (1992). In evaluating speedy trial claims, the court engages in "a balancing test, in which the conduct of both the prosecution and the defendant are weighed." *Barker v. Wingo*, 407 U.S. 514, 530 (1972). Some of the factors to be weighed include: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) the prejudice suffered by defendant as a result of the delay. *Id*.

## A. Length of the Delay

"[T]o trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay. . . ." *Doggett*, 505 U.S. at 651-52. "A delay approaching one year is presumptively prejudicial." *United States v. Robinson*, 455 F.3d 602, 607 (6th Cir. 2006) (citing *Doggett*, 505 U.S. at 652, n.1). The government agrees that the delay in this case is presumptively prejudicial and that it triggers the rest of the speedy trial analysis.

## B. Reason for the Delay

The second *Barker* factor is the reason for the delay. This factor requires the court to consider "whether the government or the criminal defendant is more to blame for that delay." *Doggett*, 505 U.S. at 651. "Because 'the prosecutor and the court have an affirmative constitutional obligation to try the defendant in a timely manner . . . the burden is on the prosecution to explain the cause of the pre-trial delay.'" *United States v. Brown*,

2

169 F.3d 344, 349 (6th Cir. 1999) (quoting *United States v. Graham*, 128 F.3d 372, 374 (6th Cir. 1997)). If the government is more to blame for the delay, the court must consider the nature of the government's responsibility for the delay: whether it is attributable to bad-faith delay, official negligence in bringing an accused to trial, or diligent prosecution. *Doggett*, 505 U.S. at 656-57.

In evaluating the reason for the delay, the Court must consider the activities of the government and Defendant between the date the indictment was returned (November 28, 2001) and the date of Defendant's arrest (May 7, 2009). No testimony was presented at the hearing on the motion to dismiss. Instead, the parties rely on the court filings, the government's documentary evidence of Defendant's arrest and incarceration history and the government's efforts to locate him, (Dkt. No. 102, Gov't Sealed Ex.), and the Defendant's documentary evidence offered in support of his contention that he was living openly prior to his arrest. (Dkt. No. 105.)

Based upon the evidence presented, the Court has constructed the following timeline.

On November 28, 2001, arrest warrants were issued for the three defendants named in the indictment. (Dkt. Nos. 5, 6, 77, Arrest Warrant Returns.)

On March 28, 2002, the DEA obtained postal money orders made out to Defendant. (Gov't Ex. 1, Evid. Tag.)

On April 10, 2002, co-defendants Ricardo Gonzalez and Javier Garcia were arrested in California. (Dkt. Nos. 5, 6, Arrest Warrant Returns.)

At the time of his arrest, Javier Garcia told Detective A. Martinez that his brother Antonio was out of the state, possibly in Oregon. (Gov't Ex. 2, Supplemental Report of A. Martinez.)

On May 7, 2002, the DEA declared Defendant a fugitive and enlisted the support of the Marshals Service in apprehending Defendant. (Gov't Ex. 3, DEA Personal History Report.) The report included information that an EPIC inquiry revealed that a subject with the same name and date of birth as Defendant had crossed at the Calexico, California border into Mexico.

On May 21, 2002, Defendant's arrest warrant was entered into the National Crime Information Center ("NCIC") database. (Gov't Ex. 4, U.S. Marshals Service Report.)

Co-defendant Ricardo Gonzalez entered a guilty plea on July 9, 2002, and was sentenced on November 5, 2002. (Dkt. No. 43, J.) Co-defendant Javier Ramos Garcia entered a guilty plea on October 9, 2002, and was sentenced on June 20, 2003. (Dkt. No. 58, J.)

Defendant was arrested in California on October 9, 2003. He identified himself as "Jose Jesus Garcia" and gave a false date of birth. (Gov't Ex. 5, Santa Cruz County Booking Sheet.)

On October 10, 2003, the Marshals Service determined Defendant's correct identity based on a fingerprint analysis, issued a federal detainer, and sent it to the Santa Cruz County

Jail. (Gov't Ex. 6, Marshals Service FAX re fingerprint identification; Gov't Ex. 7, Detainer.) The detainer included the following:

> Prior to the subject's release from your custody, please notify this office at once so that we may assume custody if necessary. If the subject is transferred from your custody to another detention facility, we request that you forward our Detainer to said facility at the time of transfer and advise this office as soon as possible.
>
> . . . IF THE SUBJECT IS SENTENCED WHILE THIS DETAINER IS IN EFFECT, PLEASE NOTIFY THIS OFFICE AT ONCE.

(Gov't Ex. 7.) The Marshals Service for the Northern District of California notified the Marshals Service for the Western District of Michigan that the detainer had been placed and that Defendant had multiple local charges. (Gov't Ex. 8.)

On March 23, 2004, the Marshals Service checked on Defendant's status and learned that he was "still going to court." (Gov't Ex. 9, Marshals Service Notes.)

On April 22, 2004, the Marshals Service again checked on Defendant's status and learned that he had been sentenced to San Quentin State Prison. (*Id.*; Gov't Ex. 10, Marshals Service Notes.)

On April 28, 2004, Defendant was transferred from the Santa Cruz County Jail to San Quentin State Prison. (Gov't Ex. 5.) According to the government, on May 26, 2004, Defendant was transferred back to the Santa Cruz County Jail, and on May 27, 2004, he was released from the Santa Cruz County Jail despite the federal detainer documented in the Santa Cruz County Jail's records.

On June 28, 2004, the Marshals service lodged a detainer with the California Department of Corrections. (Ex. 11.)

Defendant was arrested on August 10, 2004, in Monterey County based on a probation violation. Defendant was sentenced to serve 120 days at the Monterey County Jail commencing August 18, 2004, with credit for 33 days. (Ex. 12, Monterey County Superior Ct. Records.) Defendant was released from the Monterey County Jail on October 7, 2004. (Gov't Ex. 13.) According to the government, Defendant was released by Monterey County to Santa Cruz County based on an outstanding warrant. Defendant was again released by Santa Cruz County on October 8, 2004, despite the federal detainer.

On April 24, 2006, the Marshals sent a memo to San Quentin State Prison inquiring about Defendant's detainer status. San Quentin State Prison responded that Defendant had been discharged to Reg. 2. (Gov't Ex. 14.)

On September 18, 2006, the Marshals Service sent another memo to San Quentin State Prison inquiring about Defendant's detainer status and received a response that he had been discharged on "2/27/81?." (Gov't Ex. 15.)

According to the government, in October 2006, the DEA prepared a Fugitive Status report noting that Defendant's whereabouts were unknown and that the government was still willing to prosecute. On March 14, 2007, the Marshals Service re-entered Defendant's arrest warrant into NCIC. The DEA continued efforts to search for him in October 2007 and October 2008.

In March 2007 the Marshals Service for the Western District of Michigan took over the fugitive case and began making inquiries. (Gov't Ex. 16.) Deputy Marshal Mark Hessler ran Auto-track, JABS, and LIEN searches and contacted individuals at DEA and the Immigration and Naturalization Service ("INS"). He obtained information that Defendant had come into the United States through Calexico, California in September of 2006, and that Defendant probably lives in Mexicali, Mexico and is crossing both borders. Hessler FAXed a copy of the arrest warrant for Garcia to the INS. In July, September, December 2007, and April 2008, Hessler continued to check his on-line data sources and sent additional information to his border contact. The search was complicated due to the existence of another individual with the same name and date of birth who was also charged with criminal offenses in California and was reported crossing the border. (Gov't Ex. 17.)

Defendant was arrested on May 6, 2009, when he tried to cross the border into Mexico using his own name.

In determining the reason for the delay in Defendant's arrest, the Court must consider whether the government or Defendant is more to blame for the delay. *Doggett*, 505 U.S. at 651. The government contends that it was reasonably diligent in its efforts to locate and apprehend Defendant. Defendant, on the other hand, contends that the government was not reasonably diligent because he was available for arrest when he was incarcerated in 2003-04 and because, during the majority of the remainder of the time period, he was living in the open with no attempt to hide his whereabouts.

Based upon the facts of record, it appears that the DEA, the Marshals Service, and the United States Attorneys office were reasonably diligent in pursuing this prosecution and its efforts to apprehend Defendant. The federal government obtained the arrest warrant immediately after the indictment was returned, attempted to execute the arrest warrant with two weeks of obtaining critical evidence, declared Defendant a fugitive within a month of arresting the co-defendants and learning that Defendant had disappeared, discovered Defendant's identity following his arrest in 2003 despite Defendant's use of a false identity obtained a detainer, filed the detainer with the jail, checked on the status of the detainer, filed a second detainer with the prison after Defendant was sentenced, and waited for the termination of the prior state charges. As soon as the federal government discovered that State authorities had released Defendant despite the federal detainer, the federal government reactivated its efforts to find Defendant and eventually did apprehend him at the border.

There is no question that Defendant should have been arrested on the federal indictment after the State concluded its prosecution of him in 2003 and 2004. The government attempted to ensure that he would be arrested on the federal indictment by filing a detainer. The failure to arrest him on the federal indictment at that time is attributable to the State of California rather than to the federal government. The State released Defendant despite the detainer, and failed to give accurate information to the federal government when it checked on the status of the detainer.

This situation presents an issue of first impression for this Court: whether the negligence of the State authorities should be ascribed to the federal government for purposes of the Speedy Trial analysis. The Court concludes that it should not. Most of the case law does not address this situation. Where government negligence has been found, the cases have generally based their findings on the negligence of the federal agency, Marshals Service, or the United States Attorneys Office. *See*, *e.g.*, *Doggett*, 505 U.S. at 649-50 (finding a Speedy Trial violation where the government allowed an entry in the computer database used by the customs service to expire and failed to conduct a simple credit check that would have found defendant living openly); *Brown*, 169 F.3d at 347 (finding a Speedy Trial violation where the government filed a federal detainer, but failed to act on information from the state that the defendant was available for release).

The only case the Court is aware of that has directly considered the issue of state negligence on the speedy trial analysis is *United States v. Woolfolk*, No. 3:03-CR-79, 2005 WL 2100933 (W.D. Va. Aug. 31, 2005). In *Woolfolk* the Marshals Service filed a detainer with a county jail. However, because the state court failed to notify the jail that a judgment had been entered, the county jail did not contact the Marshals Service to have the defendant picked up on the detainer. Despite the delay in bringing the defendant to trial on the federal charges the court found no Speedy Trial violation because it found that the delay was due to the state jail or the state court's clerical error, and it did not attribute that negligence to the federal government. *Id.* at *4.

The Court agrees with the approach taken in *Woolfolk*. Because the State of California did not have an interest in the prosecution of Defendant, the negligence of the State of California should not be attributed to the federal government.

Even if the State's negligence is not attributed to the federal government, Defendant nevertheless contends that the federal government was not reasonably diligent because Defendant was living openly and could have been located had the government used basic investigative tools. Defendant has presented evidence that he lived at the El Redentor Church's men's facility on and off from August 25, 2005, through March 8, 2006, and then again beginning March 12, 2006, under the name Antonio Garcia Ramos. (Def. Ex. A.) As of September 2005, El Redentor Church listed Defendant's previous address as 408 Tyler, Salinas, California, and his name as Antonio Ramos Garcia. (Def. Ex. B.) As of July 2008 El Redentor Church listed Defendant's name as Antonio Garcia Ramos, and his previous address as 165 Main St., Heber, California. (Def. Ex. C.) Defendant signed the El Redentor Church form as Antonio Ramos Garcia. During some of this time period Defendant was receiving food stamps and medical assistance from the Imperial County Social Services Department at the El Redentor Church address of 304 N. 9th St., Brawley, California, under the name Antonio Ramos. (Def. Ex. E, August 2008 Notice.) The Brawley Police Department issued Defendant a bicycle helmet citation in July 2008 under the name Antonio Ramos, and listed his address as 633 Gilmour, Brawley, California. (Def. Ex. F.) The Imperial County Superior Court issued Defendant a $40 fine in August 2008 under the name

Antonio Ramos. (Ex. G.) Defendant signed the form as Antonio Garcia Ramos. (*Id.*) Defendant had a California driver license under the name Antonio Garcia Ramos. (Ex. H.) Defendant's Social Security Card is under the name Antonio Ramos Garcia. (*Id.*).

The evidence Defendant has presented in support of his claim that he was living openly and that the government could have easily located him tends to show just the opposite. Although Defendant's investigator was able to locate some information on him, she was able to work from information given to her by Defendant. Even with that significant advantage, she was not able to construct much of a paper trail relating to Defendant. Defendant appears to have been living a somewhat transient life under the radar. There is no evidence that he held a regular job, that he had any taxes withheld, that he owned any property, or that he had any credit. There is no evidence that any information regarding Defendant's whereabouts or activities was accessible on any national registry. There is no indication that the government would have known where to begin a search for Defendant. The information the government had at the time of the indictment and again at the time of Defendant's 2003 State arrest, indicated that Defendant was residing in the Salinas, Monterey, and Santa Cruz area in Central California. Since 2005, Defendant's evidence places him in the Brawley area on the California/Mexico border. Furthermore, Defendant was not consistently using the same name. Defendant's Social Security Card is under the name "Antonio Ramos Garcia." Although it appears that Defendant occasionally signed his name "Antonio Ramos Garcia," consistent with the name on his Social Security Card,

Defendant used the last name "Ramos" for all official purposes such as his driver license and his county social services file.

It appears to this Court that Defendant is more to blame for the government's failure to arrest him than is the government. Although the government did not present any direct evidence that Defendant was aware of the indictment against him, the circumstantial evidence points to a strong likelihood that Defendant was aware of the indictment. This includes the following: the indictment charged a conspiracy involving Defendant and two others, including his brother; Defendant's brother and co-defendant were arrested and convicted; Defendant used a false identity when he was arrested in 2003; the jail and the prison where Defendant was held from October 2003 to May 2004 were aware of the federal detainer on Defendant; Defendant used the last name of Ramos rather than Garcia on all official documents; Defendant moved from his previous location to a town on the border of Mexico; Defendant lived a transient life under the radar. The Court concludes that it is more likely than not that Defendant was aware of the indictment and that he was purposely attempting to evade detection.

## C. Assertion of the Right to Speedy Trial

The government also agrees that Defendant has properly asserted his right to a speedy trial by filing his motion to dismiss the indictment. *See Wilson*, 250 F.3d at 396 (holding that a motion to dismiss the indictment properly raised an objection on the basis of his right to a

speedy trial). The questions that remain for this Court's consideration are the reason for the delay and the prejudice suffered by Defendant as a result of the delay.

## D. Prejudice

"The amount of prejudice that the defendant must show depends on the reasons for the delay." *United States v. Brown*, 169 F.3d 344, 351 (6th Cir. 1999). "When the delay is lengthy and attributable to bad faith by the government, no showing of prejudice is required." *Id.* at 350. If the government used reasonable diligence to pursue the defendant, the defendant must show that the delay caused actual prejudice. *Doggett*, 505 U.S. at 657; *Brown*, 169 F.3d at 350. Between the two extremes of bad faith and reasonable diligence is the middle ground of official negligence. *Doggett*, 505 U.S. at 656-57. If the delay was caused by the government's negligence, the defendant's obligation to prove prejudice diminishes as the delay increases. *Id.* at 657; *Brown*, 169 F.3d at 350. The longer the delay that is traceable to the government's negligence, the more prejudice that will be presumed. *Wilson*, 250 F.3d at 396.

Defendant contends that the Court should presume prejudice based on the length of the delay. A presumption of prejudice based on the length of the delay will only arise if the delay is traceable to the government's conduct. *Id.*

The delay in this case was significant. Nevertheless, this Court has found that the government used reasonable diligence to pursue Defendant. Because there is no evidence of bad faith or negligence on the part of the federal government, the delay was not

13

attributable to the government's conduct, and the defendant is accordingly required to show that the delay caused him actual prejudice. *Doggett*, 505 U.S. at 657; *Brown*, 169 F.3d at 350. Actual prejudice is defined as (1) oppressive pretrial incarceration, (2) anxiety and concern, and (3) impairment of the defense. *Barker*, 407 U.S. at 532; *Brown*, 169 F.3d at 350. Defendant has made no showing or even any attempt at showing that the delay in this case caused actual prejudice. Accordingly, the Court finds no Speedy Trial violation.

## II.

Defendant has also requested relief pursuant to Rule 48 of the Federal Rules of Criminal Procedure. Rule 48 provides that the Court may dismiss an indictment if unnecessary delay occurs in bringing a defendant to trial. Fed. R. Crim. P. 48. Based on the analysis above, the Court does not find that there has been any unnecessary delay that would warrant dismissal of the indictment under Rule 48.

## III.

For the reasons stated above, the Court concludes that there has been no violation of Defendant's Sixth Amendment right to a speedy trial. Defendant's motion to dismiss will accordingly be denied.

An order consistent with this opinion will be entered.

Dated: October 1, 2009                  /s/ Robert Holmes Bell
                                                          ROBERT HOLMES BELL
                                                          UNITED STATES DISTRICT JUDGE